[Cite as *GigSmart, Inc. v. AxleHire, Inc.*, 2023-Ohio-3807.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| GIGSMART, INC., | : | APPEAL NO. C-230109 |
| | | TRIAL NO. A-2201795 |
| Plaintiff-Appellee, | : | |
| | : | *O P I N I O N.* |
| vs. | | |
| | : | |
| AXLEHIRE, INC., | : | |
| Defendant-Appellant. | : | |


Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: October 20, 2023


*Robbins, Kelly, Patterson & Tucker, Michael A. Galasso* and *Charles E. Rust*, for
Plaintiff-Appellee,

*Littler Mendelson, P.C., Mark A. Romeo, Chad J. Kaldor* and *Derek S. Hecht,* for
Defendant-Appellant.

**CROUSE, Presiding Judge.**

**{¶1}** The crux of this appeal concerns whether defendant-appellant AxleHire, Inc., had notice of online terms and conditions ("T&C") of plaintiff-appellee GigSmart, Inc., before creating an account on GigSmart's platform. The trial court found that it did, and that, by creating a GigSmart account, AxleHire agreed to be bound by the T&C, including a forum-selection clause and an arbitration provision. Based on its finding that AxleHire agreed to the T&C, the trial court issued an entry that granted GigSmart's motion to compel arbitration and stay the proceedings and denied AxleHire's motion to dismiss GigSmart's complaint, which asserted various claims pertaining to AxleHire's breach of the T&C. The trial court's entry also granted GigSmart's motion for a preliminary injunction to enjoin AxleHire from initiating or prosecuting legal proceedings in any other forum concerning the claims asserted in GigSmart's complaint.

**{¶2}** AxleHire appeals from the trial court's judgment, arguing in two assignments of error that the trial court erred in finding that it had personal jurisdiction over AxleHire because there was no enforceable contract between the parties, and that the trial court abused its discretion by issuing an antisuit injunction. We hold that the trial court did not err in finding that AxleHire had notice of the T&C before creating a GigSmart account, and that the trial court properly acquired jurisdiction over the parties via the forum-selection clause in the T&C. We further find no abuse of discretion on the part of the trial court in granting the preliminary injunction, and we affirm that court's judgment.

## I. Factual and Procedural Background

{¶3}    GigSmart is a software-development company that provides staffing for the gig economy. A gig economy is one that "involves the use of temporary or freelance workers to perform jobs typically in the service sector." *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/gigeconomy (accessed Oct. 2, 2023). GigSmart's platform connects businesses with workers looking for a gig by allowing the businesses to post gigs, and then allowing workers to apply for the gigs, get hired, and be paid, all through the platform. A business that posts a gig is referred to as a requester, while those that apply for the gigs are referred to as workers. By signing up for a GigSmart account, a requester becomes subject to GigSmart's T&C. Notification that the requester is agreeing to the T&C is provided to the requester, either on a web platform or mobile app, below the various options provided to create an account. The language providing notice states, "By signing up, I agree to Terms & Conditions & Privacy Policy." Both the phrases "Terms & Conditions" and "Privacy Policy" are hyperlinks that take a requester to those documents if clicked on, therefore providing a requester with the opportunity to review the documents prior to creating an account.

{¶4}    On August 20, 2021, a GigSmart account was created for AxleHire, a company that provides last-mile logistic solutions for freight shipment and delivery. On that date, the two companies participated in a sales call. Participating on behalf of GigSmart were Richard Oaks, president of GigSmart, and Rebecca Moore-Leach, a GigSmart sales representative. Participating on behalf of AxleHire were Mary Jackson, AxleHire's senior manager of transportation, and Aaron Murphy, AxleHire's director

of operations at that time. After this sales call ended, AxleHire's account on the GigSmart platform was created, and AxleHire posted its first gig that same day.

{¶5} The T&C included a binding-arbitration provision and a forum-selection clause providing that the relationship between GigSmart and the requester "shall be governed in all respects by the laws of the State of Ohio" and that "any claim or dispute you may have against GigSmart that is not subject to arbitration must be resolved by a court located in Hamilton County, Cincinnati, Ohio or a United States District Court, Southern District of Ohio, located in Cincinnati, Ohio." The T&C additionally contained a direct-hire provision. This provision required a requester to pay a "hiring fee" of $500 and to notify GigSmart if the requester hired a GigSmart worker outside of the GigSmart platform in the three-month period following the requester's last contact with the worker through the platform. This same provision further stated that if the requester fails to provide such notice, it "shall be obligated to immediately pay to GigSmart $2,500 for each GigSmart worker it has Hired."

{¶6} GigSmart filed a complaint against AxleHire in the Hamilton County Court of Common Pleas on May 19, 2022. The complaint alleged that AxleHire breached the direct-hire provision in the T&C by failing to report direct-hire engagement and failing to pay the incurred fees. The complaint contained claims for breach of contract and unjust enrichment, sought a declaratory judgment that GigSmart was entitled to injunctive relief and/or specific performance requiring AxleHire to report all direct-hire engagement and to account for all fees owed to GigSmart, and demanded arbitration pursuant to the arbitration provision in the T&C. The complaint sought approximately $1,902,500 for AxleHire's failure to comply with

the direct-hire provision. GigSmart separately filed a motion to compel arbitration and to stay the proceedings pending arbitration.

{¶7} On July 25, 2022, AxleHire filed a motion to dismiss GigSmart's complaint, arguing that the trial court lacked personal jurisdiction over AxleHire. It contended that the forum-selection clause in the T&C was not enforceable because AxleHire never assented to the T&C containing that clause, and that, even if the clause was valid, it was unreasonable to enforce it under the circumstances. AxleHire additionally argued that it did not otherwise have minimum contacts in Ohio sufficient for the trial court to acquire jurisdiction. AxleHire also filed a memorandum opposing GigSmart's motion to compel arbitration.

{¶8} On October 6, 2022, GigSmart filed a motion for a temporary restraining order and a preliminary injunction. The motion was filed in response to a complaint that AxleHire filed against GigSmart in Alameda County, California, seeking a declaratory judgment that GigSmart's T&C were unenforceable; that California law applies to the parties' dispute; that there is no enforceable contract between the parties; that the arbitration provision in the T&C is procedurally and substantively unconscionable; that the restrictive covenants in the direct-hire provision are unenforceable; and that the forum-selection and choice-of-law clauses are void. GigSmart's motion sought to enjoin AxleHire from commencing or prosecuting proceedings in other states, including the action filed in California, concerning the claims and defenses pending in Hamilton County.

{¶9} The trial court held a hearing on the motion for a temporary restraining order and preliminary injunction on October 20, 2022. After hearing argument from both parties, the trial court issued a temporary restraining order that enjoined

5

AxleHire "from initiating or prosecuting litigation or legal proceedings in other forums involving Plaintiff, GigSmart, Inc., pertaining to the claims which are the subject of the Complaint in the case at bar." The order specified that the order included the litigation currently pending in California.

{¶10} On December 14, 2022, the trial court held an evidentiary hearing on the motion for a preliminary injunction. A main point of contention at the hearing was whether AxleHire had notice of GigSmart's T&C when its account was created, as the trial court's jurisdiction depended on whether AxleHire had assented to the forum-selection clause contained in the T&C.

{¶11} This case involves what is referred to as a "browsewrap agreement." "[A] browse wrap license is part of the web site [, *e.g.*, license terms are posted on a site's home page or are accessible by a prominently displayed hyperlink,] and the user assents to the contract when the user visits the web site." *Rudolph v. Wright Patt Credit Union*, 2021-Ohio-2215, 175 N.E.3d 636, ¶ 55 (2d Dist.), quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 429 (2d Cir.2004). A requester does not need to click on the terms and conditions link to manifest assent, but rather agrees to be bound by the terms and conditions by signing up for an account.

{¶12} While both parties agreed that AxleHire's account was created after the sales call between the two companies on August 20, 2021, AxleHire took the position that GigSmart created the account on its behalf after the call ended, and that it was therefore never presented with the webpage stating that a requester agrees to GigSmart's T&C by creating an account. GigSmart, on the other hand, contended that AxleHire created its own account, and that it could not have done so without seeing the language concerning the T&C.

6

{¶13} Mitchell Catino, GigSmart's chief operating officer and chief product officer, testified at the hearing that a requester can access the GigSmart platform via either a web application or a native application that can be downloaded from the Apple App Store or the Google Play Store. He explained that an account can then be created on either platform via Google, Facebook, or email. On certain devices, a requester can also create an account by signing up with Apple. According to Catino, a requester is shown the same sign-up screen on both a mobile device and on the web application. He stated that "[i]t does not differ outside of, on your mobile device, there is a carousel of images. It is three images that rotate at the top. Whereas, on a wider web screen, those three images are displayed side by side, but the content, the text, across all devices is exactly the same."

{¶14} Catino testified that AxleHire's account was created at 4:04 p.m. mountain time on August 20, 2021. He explained that an account is created when an email and password are generated, and that the email used to create AxleHire's account was a.murphy@axlehire.com. GigSmart uses Mixpanel, a behavior analytics tool that allows it to visualize events that happened in its system and provides it with device data and location, which "can either come from a cellular tower based on an IP address or an actual location of a user's device." Through Mixpanel, Catino was able to determine that AxleHire's account was created in Alameda, California, but he was unable to determine how Mixpanel came to that conclusion. Catino was asked, "To be clear, it is not an IP address, right?" and he responded that "It may not be, no." Catino was then asked, "Have you been able to determine whether there was a specific IP address used to set up the GigSmart account?" He answered, "I have not, on this conversion sign-up event, no."

{¶15}  Catino testified that at 3:53 p.m. on August 20, 2021, approximately ten minutes before AxleHire's account was created, an email was sent from Moore-Leach to Jackson and Murphy at AxleHire with instructions on how to sign up for a GigSmart account. That email was opened at 4:02 p.m., two minutes before the account was created.

{¶16}  Catino did not produce an image of the web page containing the link to the T&C that was in effect on the day that AxleHire's account was created, although he testified that the current web page and the web page on August 20, 2021, were the same. Through a tool called GitLab, Catino was able to identify what code base was used on that date and to pull a "build," which represented the code base at that time. He provided a hyperlink to that build during discovery. Catino acknowledged that some of the T&C did change while AxleHire's account was in use, but stated that the terms pertaining to the arbitration provision, venue, and direct-hire clause had not been altered.

{¶17}  According to Catino, AxleHire used the GigSmart platform across 35 devices, on both web applications and native applications. Catino's search via a visualization tool called Mode revealed that AxleHire created 1,356 gigs, 744 of which were completed. Gigs were completed for AxleHire on the platform from August 22, 2021, through February 11, 2022.

{¶18}  Catino also provided background information about GigSmart during his testimony. He stated that GigSmart is a Delaware corporation that was founded in Cincinnati, Ohio, in 2017 and that its platform was developed under Ohio law as a limited liability company. GigSmart later moved to Colorado and changed its

corporate structure to an S Corp, while retaining use of Ohio law for its operations. GigSmart has both workers and requesters located in Ohio.

{¶19} Mary Jackson testified via Zoom for AxleHire. She stated that AxleHire is incorporated in Delaware and has its headquarters in Alameda County in northern California. AxleHire has no employees in Ohio, nor did it post gigs in Ohio. Most of AxleHire's executives are located in Alameda County, with the exception of a few sales teams located across the country. Jackson stated that in August of 2021, which was when AxleHire's account was created, Murphy was located in southern California.

{¶20} Jackson testified about the conference call with Moore-Leach on the date that AxleHire's account was created, stating that Moore-Leach provided a demonstration on how to book jobs through GigSmart's platform and offered to create the account for AxleHire using Murphy's email address, which GigSmart had previously been provided. Jackson testified that she asked Moore-Leach if AxleHire could have multiple accounts with individual log-in credentials, but that Moore-Leach was "very pointed" in stating that all AxleHire employees had to share a single log-in credential. Jackson provided Moore-Leach with an AxleHire call center phone number for use with the account. This number was not capable of receiving texts or SMS[1] messages to verify the account. Jackson testified that Moore-Leach told her it was permissible to use this telephone number because Moore-Leach would be creating the account for AxleHire. Jackson investigated how AxleHire's account was created, and she determined that the account credentials were created by GigSmart, stating that Murphy told her that he had not created the account.

---

[1] SMS is an acronym for "short message service," and means "a system for sending short text messages, as from one cell phone to another or from a computer to a cell phone." *Dictionary.com*, https://www.dictionary.com/browse/sms (accessed Oct. 18, 2023).

{¶21} Jackson testified about the email that she received on August 20, 2021, from Moore-Leach containing instructions on how to set up an account. She stated that she was quite confused upon receiving that email because "we had already created an account, and it had been stated that the account was created for us. Should say, we had already had an account created and it was created by the GigSmart people." Jackson further testified that she received a similar email from Moore-Leach on October 1, 2021, with instructions on how to set up an account. This email was sent after a call between Moore-Leach and Melissa Baretto, another AxleHire employee, that occurred on that date regarding AxleHire's ability to have additional login credentials. Jackson again thought it was odd for this email to have been sent, as AxleHire had been repeatedly told that they could only have a single login for all employees.

{¶22} While testifying that Moore-Leach set up the account for AxleHire, Jackson was not able to explain how the password for the account was generated. She stated that Murphy had not provided a password on the call, but that he later verbally gave her the password to use when logging into the account. In support of her testimony that AxleHire had not set up its own account, Jackson testified that:

Well, first, based on the information provided in the phone call, there would have been a verification that came back to a phone number. Since the phone number provided cannot receive text messages, that would be my first indication.

Second, there would have been an email verification to say that, your account has been created. And there was none.

10

{¶23} Kevin Lau, AxleHire's head of finance, also testified, stating that he had not received any emails from GigSmart relating to creating an account for AxleHire. He identified the password to AxleHire's account, and stated that Murphy had given him the password.

{¶24} The last witness to testify was Richard Oaks, who stated that no one on behalf of GigSmart offered to create an account for AxleHire on the telephone call on August 20, 2021. Oaks was adamant that GigSmart does not create accounts for business users or workers. When asked whether a text-message verification was necessary to create an account, Oaks testified that such a requirement can be bypassed.

{¶25} In addition to the testimony offered at the hearing, the trial court was also presented with several affidavits from GigSmart and AxleHire in support of their respective arguments and positions. An affidavit of Murphy stated that he was not in Alameda, California, when participating in the August 20, 2021 conference call, but rather was in southern California. It further stated that he had not created AxleHire's account, and that Moore-Leach offered during the call to set up the account using Murphy's email address. Murphy signed into the account using credentials that Moore-Leach created for AxleHire.

{¶26} An affidavit from Catino stated that GigSmart did not set up the account of behalf of AxleHire and that [u]nless part of a managed service relationship and subject to a separate agreement, GigSmart does not create user accounts.

{¶27} On February 15, 2023, the trial court issued an entry granting the motion for a preliminary injunction. In the entry, the court recognized that before granting any injunctive relief, it first had to determine whether AxleHire was subject to the T&C applicable to users of GigSmart's website. The court rejected AxleHire's

argument that GigSmart created the account on its behalf and found that there was clear and convincing evidence that AxleHire created the account and was properly subject to the T&C. In so finding, the trial court made the following credibility determinations:

The Court had the opportunity to observe Ms. Jackson's testimony during the preliminary injunction hearing. Although she testified by Zoom, it was very clear to the Court that she exhibited numerous telltale verbal and nonverbal signs of untruthfulness during her testimony. In several instances, Ms. Jackson hesitated briefly before responding, looking up and away from the camera before providing her response. Some of her responses struck the Court as stilted and likely scripted. Others, such as her remarks that the internal spreadsheet was deleted and her failure to review her former colleague's emails, struck the Court as self-serving and disingenuous. In one telling instance, she caught and corrected herself about the precise issue in this case midway through an answer (i.e., "My reaction was that I was unsure or actually quite confused as to why I receive this [email], as we had already created an account, and it had been stated that the account was created for us. Should say, we had already had an account created and it was created by the GigSmart people.")

The Court recognizes that witnesses may be anxious and that credibility can be challenging to assess, but it is not difficult in this case. Ms. Jackson is a current employee of AxleHire which is facing a potential multi-million dollar claim. The only evidence of any significance

12

supporting AxleHire's position is her testimony. No doubt she feels significant pressure to support the position of her employer, which she exhibited in abundance during her testimony. The indicia of untruthfulness in Ms. Jackson's testimony coupled with the evidence presented by GigSmart are clear and convincing evidence that AxleHire established the account and is properly subject to GigSmart's terms and conditions.

{¶28} The trial court found that AxleHire, having created its own account, was subject to the T&C, including the arbitration provision and the forum-selection clause. The court additionally found that enforcement of the forum-selection clause was not unreasonable. It accordingly granted GigSmart's motion to compel arbitration and denied AxleHire's motion to dismiss. With respect to the portion of its entry granting the motion for a preliminary injunction, the court stated that GigSmart had sufficiently demonstrated a likelihood of success on the merits, that GigSmart faced irreparable injury, that any injury suffered by AxleHire would not outweigh the potential injury suffered by GigSmart absent relief, and that the public interest would be served by an antisuit injunction. It ordered that "AxleHire is enjoined from initiating or prosecuting litigation or legal proceedings in any other forum involving GigSmart relating to the claims presented in this matter."

{¶29} AxleHire now appeals from this entry.

## II. Personal Jurisdiction

{¶30} In its first assignment of error, AxleHire argues that the trial court erred by finding it had personal jurisdiction over AxleHire as there was not an enforceable

13

contract between the parties. It further contends that, even if there were an enforceable contract, the forum-selection clause was unreasonable.

{¶31} The existence of a contract is a question of law that we review de novo. *N. Side Bank & Trust Co. v. Trinity Aviation, LLC*, 2020-Ohio-1470, 153 N.E.3d 889, ¶ 17 (1st Dist.). However, "[a]ny factual findings regarding the circumstances surrounding the making of the contract should be reviewed with great deference." *Whitman v. Stepping Stone Residential Facility LLC*, 5th Dist. Tuscarawas No. 2022 AP 10 0038, 2023-Ohio-2661, ¶ 16; *see Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, ¶ 38; *Paulozzi v. Parkview Custom Homes, L.L.C.*, 2018-Ohio-4425, 122 N.E.3d 643, ¶ 13 (8th Dist.). We also review de novo the trial court's determination that it had personal jurisdiction over AxleHire. *Edwards v. Horton*, 1st Dist. Hamilton No. C-220123, 2022-Ohio-3989, ¶ 8.

### A. A Contract Was Formed

{¶32} The parties do not dispute that a contract created by a browsewrap agreement such as the one in this case is enforceable. Courts have held that an agreement to such terms and conditions by creating an account or visiting a website is enforceable where the terms and conditions were conspicuous and reasonably communicated to the user. *Rudolph*, 2021-Ohio-2215, 175 N.E.3d 636, at ¶ 55, citing *Traton News, LLC v. Traton Corp.*, 914 F.Supp.2d 901, 909 (S.D.Ohio 2012); *Freeplay Music, LLC v. Dave Arbogast Buick-GMC, Inc.*, S.D.Ohio No. 3:17-cv-42, 2019 U.S. Dist. LEXIS 163383, 30 (Sept. 24, 2019).

{¶33} The trial court's personal-jurisdiction determination was based on its finding that a contract was formed when AxleHire assented to the T&C containing the forum-selection clause by signing up for an account with GigSmart. AxleHire argues

14

that the trial court erred in finding that AxleHire assented to the T&C when it opened an account because the evidence showed that someone from GigSmart opened the account for AxleHire.

{¶34} GigSmart presented evidence in support of its contention that AxleHire created its own account. Oaks testified that GigSmart does not create accounts for requesters. Catino's affidavit elaborated on this point, stating that unless a requester is part of a managed-service relationship (which AxleHire was not), the requester must set up its own account. GigSmart also established that following the sales call on August 20, 2021, Moore-Leach sent an email to AxleHire employees with instructions on how to sign up for a GigSmart account. Two minutes after that email was opened, AxleHire's account was created. Additionally, evidence was presented that while GigSmart was based in Colorado, AxleHire's account was created in Alameda, California, where AxleHire was based.

{¶35} AxleHire presented evidence, predominantly through Jackson's testimony, in support of its contention that GigSmart created AxleHire's account. Jackson testified that Moore-Leach offered to set up the account during the sales call on August 20, 2021. She contended that AxleHire could not have set up the account because it used a telephone number that was not able to receive the necessary text message verification. GigSmart, however, refuted this contention with Oaks's testimony that this verification requirement could be bypassed. To counter any contention that Murphy created the account (as it was created with his email address), AxleHire submitted evidence that Murphy was located in southern California at the time when the account was created in northern California. While this evidence, if believed, eliminated Murphy as the creator of the account, it did not negate the

15

possibility that another AxleHire employee created the account in Alameda with Murphy's email address.

**{¶36}** One major shortfall to AxleHire's argument is the creation of the password to access AxleHire's account. There is no dispute that the account cannot be accessed without the password, and that the password had to be generated to create the account. If Moore-Leach had created the account for AxleHire, the password had to have been conveyed to AxleHire in some manner. However, neither Jackson nor Murphy, who participated in the call when the account was allegedly created by GigSmart, recalled Moore-Leach providing them with a password during the call. Nor was any email or record presented of the password otherwise being conveyed to AxleHire.

**{¶37}** As we evaluate whether AxleHire assented to the T&C and entered into a contract with GigSmart, we must give due deference to the trial court's factual findings and credibility determinations. *See Whitman*, 5th Dist. Tuscarawas No. 2022 AP 10 0038, 2023-Ohio-2661, at ¶ 16; *Zimmerview Dairy Farms, LLC v. Protégé Energy III LLC,* 4th Dist. Washington No. 21CA1, 2022-Ohio-1282, ¶ 23, quoting *GM Gas Exploration, Inc. v McClain*, 4th Dist. Athens No. 1438, 1991 Ohio App. LEXIS 4083, 3-4 (Aug. 13, 1991) ("The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."). Here, the trial court explicitly found Jackson's testimony to lack credibility, going so far as to find it untruthful. It supported this finding with specific examples of Jackson's behavior and word choice used in her testimony.

16

{¶38} AxleHire argues that the trial court improperly shifted the burden on AxleHire to prove a negative, specifically that it did not assent to the T&C. We disagree with this contention. First, AxleHire presented Jackson as a witness and the trial court was entitled to evaluate her credibility. Second, GigSmart presented sufficient testimony, as set forth above, for the trial court to find that AxleHire created its own account even if the court did not consider any testimony presented by AxleHire.

{¶39} Following our review of the record, and considering not only the trial court's credibility determinations but also its findings regarding the circumstances surrounding the making of the contract, we hold that the record contains sufficient, clear and convincing evidence that AxleHire created its own account with GigSmart. In doing so, it necessarily had notice of and assented to the T&C, including the forum-selection clause.

### B. Reasonableness of the Forum-Selection Clause

{¶40} We next consider AxleHire's argument that the forum-selection clause was unenforceable because it was unreasonable.

{¶41} In support, AxleHire argues that neither party has any connection to Ohio, as both are Delaware corporations, with AxleHire's headquarters in California and GigSmart's headquarters in Colorado. It further argues that neither company has any offices or employees in Ohio. While these contentions are correct, we note that Ohio was not chosen as the forum at random. Rather, GigSmart was initially founded in Ohio and the platform was developed under Ohio law before GigSmart moved its headquarters to Colorado.

{¶42} Unless it can be shown that enforcement of a forum-selection clause would be unreasonable or unjust, such a clause contained in a commercial contract

between business entities is valid and enforceable absent evidence of fraud or overreaching. *Kennecorp Mtge. Brokers, Inc. v. Country Club Convalescent Hosp., Inc.*, 66 Ohio St.3d 173, 610 N.E.2d 987 (1993), syllabus. Applying this proposition of law, the Supreme Court of Ohio has adopted a three-pronged test to determine the validity of a forum-selection clause: "(1) Are both parties to the contract commercial entities? (2) Is there evidence of fraud or overreaching? (3) Would enforcement of the clause be unreasonable and unjust?" *Preferred Capital, Inc. v. Power Eng. Group, Inc.*, 112 Ohio St.3d 429, 2007-Ohio-257, 860 N.E.2d 741, ¶ 7, citing *Kennecorp* at syllabus. Here, AxleHire only challenges the last prong of this test. It does not dispute that both parties to the contract are commercial entities and makes no allegations of fraud or overreaching.

**{¶43}** This court has explained that, in considering whether enforcement of a forum-selection clause would be unreasonable, "courts are to determine whether the chosen forum is so inconvenient as to, in effect, afford no remedy at all, thus 'depriv[ing] litigants of their day in court.' " *Information Leasing Corp. v. Jaskot*, 151 Ohio App.3d 546, 2003-Ohio-566, 784 N.E.2d 1192, ¶ 18 (1st Dist.), quoting *Kennecorp* at 176.

**{¶44}** AxleHire urges this court to rely on the factors set forth in *Barrett v. Picker Internatl., Inc.*, 68 Ohio App.3d 820, 825, 589 N.E.2d 1372 (8th Dist.1990), to determine the reasonableness of a forum-selection clause. These factors are "(1) which law controls the contractual dispute; (2) what residency do the parties maintain; (3) where will the contract be executed; (4) where are the witnesses and parties to the litigation located; and (5) whether the forum's designated location is inconvenient to the parties." *Id.*, citing *Clinton v. Janger*, 583 F.Supp. 284, 289 (N.D.Ill.1984). It

contends that, under these factors, California law should be applied to the parties' dispute. AxleHire made this same argument to the trial court, which found the argument to be misplaced. The trial court stated that these factors do not supplant the basic standard of reasonableness or limit the court's discretion in determining whether enforcement of the forum-selection clause was reasonable. It nonetheless stated that it had considered the factors and that they did not sway the court's determination that enforcement of the clause was not unreasonable.

**{¶45}** We agree with the trial court's finding that these factors do not supplant the basic standard of reasonableness and that the trial court was not required to consider them. In *Total Quality Logistics, LLC v. DeSantis*, S.D.Ohio No. 1:18-cv-00796, 2020 U.S. Dist. LEXIS 21299, 6-7 (Feb. 7, 2020), the court intimated that these factors need not be considered when both parties to the contract are commercial entities, but rather that they are to be applied in the employment context. The court stated:

> As a general matter, a forum selection clause "is prima facie valid as long as the parties freely bargained for it." *Bohl v. Hauke*, 180 Ohio App. 3d 526, 2009-Ohio-150, 906 N.E.2d 450, 455 ¶ 13 (citing *Kennecorp Mortg. Brokers, Inc. v. Country Club Convalescent Hosp., Inc.*, 66 Ohio St. 3d 173, 175, [ ], 610 N.E.2d 987, 989 [(1993)]). In the absence of evidence of fraud or overreaching, a court should enforce the clause "unless it can be clearly shown that enforcement of the clause would be unreasonable and unjust." (*Id.*).
>
> The Court recognizes that the contract in *Kennecorp* was between two commercial entities, whereas, here, the agreement is between employer

19

and employee. And, in the employment context, "the presumption of validity in *Kennecorp* does not apply, and other factors must be considered." *Buckeye Check Cashing of Ariz., Inc. v. Lang*, No. 2:06-cv-792, 2007 U.S. Dist. LEXIS 12746, 2007 WL 641824, at *4 (S.D. Ohio Feb. 23, 2007) (citing *Deaconess Homecare, Inc. v. Waters*, No. C-990277, 1999 WL 1488974, at *1 (Ohio Ct. App. Dec. 8, 1999)). *Id*. The court then listed the *Barrett* factors as the other factors to be considered in the employment context.

**{¶46}** The Eighth District, which is the same district that decided *Barrett*, has also acknowledged that it was not necessary to consider additional factors when the challenged forum-selection clause was in a contract between two sophisticated business entities. *Zilbert v. Proficio Mtge. Ventures L.L.C.*, 8th Dist. Cuyahoga No. 100299, 2014-Ohio-1838, ¶ 23, citing *Deaconess Homecare, Inc. v. Waters*, 1st Dist. Hamilton No. C-990277, 1999 WL 1488974 (Dec. 8, 1999). The *Zilbert* court did consider the *Barrett* factors, as the challenged forum-selection clause in that case was contained in an employment contract. *Id* at ¶ 23 and 27.

**{¶47}** We agree with the Southern District of Ohio and the Eighth District in *Zilbert* and find that the factors set forth in *Barrett* need not be considered when both parties to the contract are sophisticated commercial entities.

**{¶48}** In this case, we hold that it is not unreasonable to enforce the forum-selection clause requiring the case to be litigated in Ohio. This chosen forum is not so inconvenient as to afford no remedy at all or deprive a litigant of its day in court. *See Jaskot*, 151 Ohio App.3d 546, 2003-Ohio-566, 784 N.E.2d 1192, at ¶ 18. As we held in *Jaskot*, "[a] finding of unreasonableness or injustice must, however, be based on more

20

than inconvenience to the party seeking to avoid the forum-selection clause's requirements." *Id.* at ¶ 19. Tempering any inconvenience to AxleHire caused by litigating in Ohio is the availability of remote hearings, which have in fact been held in this case. And even if the parties were required to travel to Ohio, we cannot find such travel "is so inconvenient as to, in effect, afford no remedy at all." *Id.* at ¶ 18.

{¶49} Having found that by creating a GigSmart account, AxleHire assented to the T&C, and that enforcement of the forum-selection clause was not unreasonable, we accordingly overrule AxleHire's first assignment of error.

### III. Preliminary Injunction

{¶50} In its second assignment of error, AxleHire argues that the trial court abused its discretion by issuing an antisuit injunction in excess of its authority that barred AxleHire from pursuing legal action outside Ohio and without finding the requisite elements of a preliminary injunction.

### A. Finality of Order Granting Preliminary Injunction

{¶51} GigSmart argues that this court lacks jurisdiction to review the portion of the trial court's order granting the preliminary injunction because it is not a final, appealable order.

{¶52} This court only has jurisdiction to review final and appealable orders. Ohio Constitution, Article IV, Section 3(B)(2); R.C. 2505.03. R.C. 2505.02(B) sets forth what constitutes a final order. As the trial court's order in this case granted a preliminary injunction, which pursuant to R.C. 2505.02(A)(3) is a provisional remedy, it falls under the purview of R.C. 2505.02(B)(4). This section provides that a final order is:

An order that grants or denies a provisional remedy and to which both

of the following apply:

(a) The order in effect determines the action with respect to the

provisional remedy and prevents a judgment in the action in favor of the

appealing party with respect to the provisional remedy.

(b) The appealing party would not be afforded a meaningful or effective

remedy by an appeal following final judgment as to all proceedings,

issues, claims, and parties in the action.

R.C. 2505.02(B)(4).

{¶53} For the trial court's order granting the preliminary injunction to be final and appealable, it must satisfy both prongs of R.C. 2505.02(B)(4). *Preterm-Cleveland v. Yost*, 1st Dist. Hamilton No. C-220504, 2022-Ohio-4540, ¶ 12*, discretionary appeal allowed*, 169 Ohio St.3d 1457, 2023-Ohio-758, 204 N.E.3d 564. The first prong is satisfied if "there existed nothing further for the trial court to decide with respect to the provisional remedy." *Id*. at ¶ 13, quoting *In re Special Docket No. 73958*, 115 Ohio St.3d 425, 2007-Ohio-5268, 875 N.E.2d 596, ¶ 29. This requirement is satisfied in the case at bar. The trial court enjoined AxleHire from filing suit and engaging in litigation relating to the claims in this case in any other jurisdiction, including the pending California action. Other than lifting the injunction, there is no further action for the court to take with respect to the provisional remedy.

{¶54} The second prong of R.C. 2505.02(B)(4) is satisfied where the appealing party shows that "if it cannot appeal now, it will be deprived of 'a meaningful or effective remedy' if it must await 'an appeal following final judgment as to all proceedings.'" *Id*. at ¶ 15, quoting R.C. 2505.02(B)(4)(b). GigSmart contends that the

purpose of the antisuit injunction in this case was to preserve the status quo of the parties, and that AxleHire will be able to pursue a meaningful remedy at a later date.

**{¶55}** In *Pre-Term Cleveland*, this court discussed whether preliminary injunctions issued to maintain the status quo are final and appealable. *Id.* at ¶ 21. We stated:

> "[C]ourts have found that 'a preliminary injunction which acts to maintain the status quo pending a ruling on the merits is not a final appealable order under R.C. 2505.02.' " *Quinlivan v. H.E.A.T. Total Facility Solutions, Inc.*, 6th Dist. Lucas No. L-10-1058, 2010-Ohio-1603, ¶ 5, quoting *Hootman* [*v. Zock*], 11th Dist. Ashtabula No. 2007-A-0063, 2007-Ohio-5619, at ¶ 15, and *E. Cleveland Firefighters, IAFF Local 500 v. City of E. Cleveland*, 8th Dist. Cuyahoga No. 88273, 2007-Ohio-1447, ¶ 5; *see In re Estate of Reinhard*, 12th Dist. Madison No. CA2019-11-028, 2020-Ohio-3409, ¶ 17. In the context of preliminary injunctions, various Ohio appellate districts have defined "status quo" as the "last, actual, peaceable, uncontested status which preceded the pending controversy." *Taxiputinbay [, LLC v. Put-In-Bay]*, 6th Dist. Ottawa No. OT-20-021, 2021-Ohio-191, at ¶ 17, quoting *Quinlivan* at ¶ 5, and *Hootman* at ¶ 16.
>
> Ohio courts generally do not permit immediate appellate review of preliminary injunctions that preserve the status quo because, if the status quo is being preserved, the aggrieved party will have an opportunity to obtain its "meaningful or effective remedy" if a permanent injunction is issued. In other words, if the status quo doesn't

change—the party isn't truly harmed (at least in the manner contemplated by R.C. 2505.02(B)(4)(b)). Needless to say, any party losing a preliminary injunction decision can muster some claim of immediate harm, but the statute keeps our eyes on the "meaningful or effective remedy" standard. And with respect to preliminary injunction orders that preserve the status quo, Ohio courts have spoken.

*Id.* at ¶ 21-22.

**{¶56}** The preliminary, antisuit injunction issued in this case maintained the status quo of the parties pending resolution of the action in Hamilton County, which has been stayed pending arbitration. This injunction is distinguishable from the injunctions issued to preserve the status quo discussed in *Yost*. As *Yost* recognized, "if the status quo is being preserved, the aggrieved party will have an opportunity to obtain its 'meaningful or effective remedy' if a permanent injunction is issued." *Yost,* 1st Dist. Hamilton No. C-220504, 2022-Ohio-4540, at ¶ 22. Notably, no permanent injunction has been sought in this case. The trial court stated that the preliminary injunction was "to remain in effect at all times during the pendency of this action unless otherwise ordered by the Court." Although labeled a "preliminary injunction," the injunction issued by the trial court had the same effect as a permanent injunction. The injunction also has no end date. It is to remain in effect during the "pendency of the action," but the action is currently stayed pending arbitration.

**{¶57}** Under these circumstances, we cannot find that AxleHire will be afforded a meaningful or effective remedy at a later date. If AxleHire is not permitted to appeal the preliminary, antisuit injunction at this point, it will never be able to challenge that order. To be certain, AxleHire will be able to appeal any final judgment

issued by the trial court. But per the language of the trial court's order, the injunction will be lifted upon resolution of the action before the trial court. At that point, there will be no active injunction to challenge.

**{¶58}** We therefore hold that AxleHire has satisfied both prongs of R.C. 2505.02(B)(4), and that the trial court's order granting the preliminary injunction is final and appealable.

### B. No Abuse of Discretion in Granting Preliminary Injunction

**{¶59}** We now turn to the propriety of the antisuit injunction. We review a trial court's grant of a preliminary injunction for an abuse of discretion. *Castillo-Sang v. Christ Hosp. Cardiovascular Assocs., LLC*, 1st Dist. Hamilton No. C-200072, 2020-Ohio-6865, ¶ 16.

**{¶60}** AxleHire argues that the trial court lacked authority or power to issue an antisuit injunction against it because it is not an Ohio citizen. In support of this argument, AxleHire relies on *Labak v. Graznar*, 54 Ohio App. 191, 6 N.E.2d 790 (5th Dist.1935), syllabus, for the proposition that an antisuit injunction may only be issued "where all of the parties to such suit reside in this state within the county in which the injunction is sought." In *Labak*, while both parties resided in Stark County, Ohio, Labak had filed suit against Graznar in a Czechoslovakian court to recover moneys owed on a grocery account. *Id.* at 192. Graznar sought an injunction to prevent further prosecution in the courts of Czechoslovakia. *Id.* at 193. The Fifth District held that "[t]o permit Labak to prosecute his claim in a Czechoslovakian court is to countenance the perpetration of a gross fraud" and that the only purpose in filing suit in Czechoslovakia was to evade the laws of Ohio. *Id.* at 194. We do not find the facts of *Graznar* to be analogous to the case at bar. Nor do we find that the case stands for the broad

25

proposition of law advanced by AxleHire, namely that a trial court may not issue an antisuit injunction over a party that is not an Ohio citizen.

{¶61} AxleHire also relies on *New York, Chicago, and St. Louis RR. Co. v. Matzinger*, 136 Ohio St. 271, 25 N.E.2d 349 (1940), in support of its argument that the trial court lacked jurisdiction to issue an antisuit injunction. In *Matzinger,* the court considered whether an appellate court had erred in issuing an injunction restraining a railroad passenger from proceeding with a case pending against the railroad in a court in Cook County, Illinois. *Id.* at 272. The court recognized that the Illinois court had jurisdiction over both the subject-matter of the case and the parties. *Id.* at 273. It then explained that it was venue, rather than jurisdiction, that was at issue in the case. *Id.* at 275-276. The court ultimately concluded that, under the facts of the case, the appellate court was authorized to issue the injunction restraining the action from being maintained in the Illinois court. *Id* at 277-278. We find *Matzinger* to be inapposite to our analysis in the case at bar.

{¶62} An antisuit injunction "is an equitable remedy that allows one court to 'control the conduct of persons subject to their jurisdiction to the extent of forbidding them from suing in foreign jurisdictions.' " *Beijing Fito Med. Co. v. Wright Med. Technology, Inc.*, 763 Fed.Appx. 388, 399, (6th Cir.2019), quoting *Gau Shan Co. Ltd. v. Bankers Trust Co.*, 956 F.2d 1349, 1352 (6th Cir.1992). Antisuit injunctions may be issued "to prevent threats to the forum court's jurisdiction or to stop one party from evading an important public policy of the forum court." *Id.*, citing *Gau Shan* at 1355.

{¶63} While "[p]arallel proceedings rarely threaten a forum court's jurisdiction," enforcing a forum-selection clause is an important public policy and courts have upheld antisuit injunctions issued for such a purpose. *Id.* at 399-400.

Although *Beijing Fito* concerned a forum-selection clause between an American company and a Chinese company and whether parallel litigation in China could be enjoined, its holding is nonetheless applicable in the case at bar. *Beijing Fito* held that a proper basis for awarding an antisuit injunction would be "to prevent [a party] from evading an important public policy." *Id.* at 399. The concern is that once a court determines that the forum-selection clause should be enforced, then public policy favors an injunction against a lawsuit in a different jurisdiction. In the case at bar, the trial court held that the Ohio forum-selection clause in GigSmart's T&C was reasonable. The issuance of the injunction in this case furthered the public policy in favor of enforcing forum-selection clauses and prevented AxleHire from avoiding a jurisdiction that it knowingly agreed to when entering into the contract. The antisuit injunction was issued to enforce the forum-selection clause and prevent AxleHire from filing suit and potentially obtaining conflicting judgments in other jurisdictions. We accordingly reject AxleHire's argument that the trial court lacked authority to issue the antisuit injunction.

{¶64} A party seeking a preliminary injunction must show the following by clear and convincing evidence: "(1) there is a substantial likelihood that she/he will prevail on the merits, (2) she/he will suffer irreparable injury if the injunction is not granted, (3) no third parties will be unjustifiably harmed if the injunction is granted, and (4) the public interest will be served by the injunction." *Christ Hosp. Cardiovascular Assocs., LLC*, 1st Dist. Hamilton No. C-200072, 2020-Ohio-6865, at ¶ 16, citing *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 267-268, 747 N.E.2d 268 (1st Dist.2000). "A court must balance all four factors in determining whether to grant or deny injunctive relief, and no one factor is determinative."

27

*Brookville Equip. Corp. v. Cincinnati*, 1st Dist. Hamilton No. C-120434, 2012-Ohio-3648, ¶ 11.

**{¶65}** Turning to the first factor, there is a substantial likelihood that GigSmart will prevail on the merits of the dispute. In the context of this case, the "merits" concerns whether AxleHire assented to the T&C when creating its GigSmart account, necessarily subjecting itself to the forum-selection clause and the arbitration provision. Based on our resolution of the first assignment of error, in which we held that AxleHire created its own account, we find a substantial likelihood that GigSmart will prevail on the merits.

**{¶66}** The second factor to be considered is whether GigSmart will suffer irreparable injury if the injunction is not granted. An irreparable injury is "a harm for which no plain, adequate, or complete remedy at law exists." *Id.* at ¶ 23. "[T]he harm threatened must be irreparable, and the movant must make some showing as to why the harm cannot be remedied through compensatory damages. Merely concluding that irreparable harm will result is not sufficient—the law does not recognize an injunction by accusation." *Aero Fulfillment Servs., Inc. v. Tartar*, 1st Dist. Hamilton No. C-060071, 2007-Ohio-174, ¶ 27. A demonstration of actual harm is not required, and threatened harm is sufficient to meet this requirement. *Brookville Equip. Corp.* at ¶ 23.

**{¶67}** In the absence of an antisuit injunction, GigSmart will have to participate in AxleHire's lawsuit in California, necessarily requiring the expense of time and money. Multiple lawsuits further present the risk of receiving conflicting results from different courts. AxleHire argues that GigSmart's contention that it will suffer irreparable injury is tempered by the fact that GigSmart waited until October 6,

28

2022, to move for injunctive relief when the California lawsuit was filed by AxleHire on July 20, 2022. AxleHire is correct—GigSmart's dilatory action in seeking injunctive relief substantially weakens its argument that it will be irreparably harmed by having to defend the same claims in another lawsuit. *Aero Fulfillment Servs., Inc.* at ¶ 33. However, GigSmart has demonstrated that it faces a harm that potentially cannot be remedied through compensatory damages. If AxleHire's California litigation proceeds, and that court were to hold that no enforceable contract exists between the parties, the parties would be left with conflicting judgments and no clear resolution to their conflict.

{¶68} The third factor to be considered is whether any third parties will be unjustifiably harmed if the injunction is granted. This factor weighs in favor of granting the injunction. AxleHire contends that California employees would benefit from the action being filed in California because they would be protected by the enforcement of a specific provision of the California Business & Professions Code, which prohibits restraints on trade like the direct-hire fee included in the T&C, which not only prohibited AxleHire from contacting workers that it had interacted with on the GigSmart platform, but prohibited AxleHire from hiring such workers even if the workers initiated contact with AxleHire. While the California employees may have an interest in this litigation, we cannot find that these employees would be unjustifiably harmed by the granting of the injunction.

{¶69} The last factor to be considered is whether the public interest will be served by the injunction. As recognized in *Beijing Fito*, 763 Fed.Appx. at 399-400, enforcing a forum-selection clause is an important public policy. Because the

injunction in this case was issued for this exact purpose, we find that it serves the public interest.

**{¶70}** Based on our analysis of the above factors, we find no abuse of discretion by the trial court in issuing the antisuit injunction. AxleHire's second assignment of error is overruled.

### IV. Conclusion

**{¶71}** The trial court did not err in determining that AxleHire assented to GigSmart's T&C, including the forum-selection clause, by creating its account on GigSmart's platform, and that enforcement of the forum-selection clause was not unreasonable. Nor did it err in issuing the preliminary, antisuit injunction. The judgment of the trial court is, accordingly, affirmed.

Judgment affirmed.

**ZAYAS** and **BOCK, JJ.,** concur.


Please note:

The court has recorded its entry on the date of the release of this opinion.